UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                  :

   - v. –                                            :                    S1 11 Cr. 111 (NRB)

FRANCIS AHISSOU,                               :

              Defendant.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

CHRISTIAN EVERDELL
AIMEE HECTOR
GLEN A. KOPP
Assistant United States Attorneys
   - Of Counsel -

## CONTENTS

I.  Preliminary Statement ................................................................................................. 1

II.  Background ............................................................................................................... 1

    A.    Introduction ................................................................................................. 1

    B. Ahissou's Criminal Conduct ........................................................................ 2

    C.    Ahissou's Guilty Plea .................................................................................. 5

    D.    The Presentence Investigative Report .......................................................... 6

III.  Argument .................................................................................................................. 6

    A.    Applicable Law ........................................................................................... 6

    B.    The Court Should Impose a Guidelines Sentence .......................................... 8

    C.    The Defense's Arguments for Extreme Leniency are Unavailing ................... 10

IV.  Conclusion ............................................................................................................... 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :

  - v. –                                           :            S1 11 Cr. 111 (NRB)

FRANCIS AHISSOU,                          :

          Defendant.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the

sentencing of Francis Ahissou ("Ahissou"), which is scheduled for August 7, 2013, and in

response to Ahissou's sentencing letter of July 26, 2013 ("Deft. Sent. Ltr."). The defendant

participated in a conspiracy to import hundreds of kilograms of cocaine into the United States for

the benefit of the Taliban. His conduct calls for a sentence within the Guidelines range of 135 to

168 months' imprisonment. The narcotics trafficking crime to which Ahissou pleaded guilty is

an extremely serious one, and there is a compelling need to deter him and others from future

criminal activity of this type.

## II. BACKGROUND

### A.    Introduction

From the spring of 2010, through early 2011, agents of the Drug Enforcement

Administration ("DEA") conducted an undercover investigation targeting drug trafficking in

West Africa, among other conduct. The DEA initially used two confidential sources ("CS-1"

and "CS-2"; collectively, the "Confidential Sources") to pose as representatives of the Taliban

and to meet with targets of the investigation to discuss a proposed narcotics transaction.  During the course of the investigation, Maroun Saade, a co-defendant, introduced Ahissou to the Confidential Sources as someone who could provide multi-kilogram quantities of cocaine. Ahissou met and communicated numerous times with the Confidential Sources and during those contacts was advised that the Confidential Sources were representatives of the Taliban. Nevertheless, Ahissou agreed to help the Confidential Sources acquire multi-hundred kilograms of cocaine in West Africa for later importation into the United States.  Further, Ahissou engaged in this conduct after being informed, repeatedly, that the Taliban intended to use the proceeds from the drug sales to purchase weapons that would be used against United States citizens.  In connection with the proposed transaction with the Confidential Sources, Ahissou ultimately acquired 800 grams of cocaine that were provided to CS-1 as a sample of a larger quantity that would be supplied to the Confidential Sources for importation into the United States.

**B. Ahissou's Criminal Conduct**

On June 26, 2010, in Ghana, Ahissou and co-defendants Saade and Walid Nasr met with CS-1 and CS-2.  At the meeting, CS-1 and CS-2 explained that they required assistance in two endeavors.  First, they were interested in purchasing large quantities of cocaine.  Second, they needed assistance in setting up a transportation route for Taliban heroin from Pakistan through West Africa.[1]  Saade told CS-1 and CS-2 that he could supply them with large quantities of Colombian cocaine and that Ahissou would be responsible for negotiating the sale of the cocaine.  Saade also told CS-2 that his organization could receive the heroin and store it in stash houses in West Africa. (Presentence Investigative Report ("PSR") ¶ 23).

---

[1] At Saade's insistence, Ahissou was ultimately excluded from the heroin portion of the transaction.

Throughout July and August 2010, Saade and Nasr participated in a series of telephone calls with CS-1 and CS-2, in which the parties discussed the heroin and cocaine transactions and arranged to meet again in late August.  Also in July 2010, Ahissou engaged in a series of email communications with CS-2, during which Ahissou and CS-2 discussed the purchase of a sample of cocaine.  During the communications with Ahissou, CS-2 reiterated that the proceeds from the future cocaine sales would benefit the Taliban.

Ahissou next met with CS-1 on August 24, 2010, and again on August 25, 2010.  During the first meeting, CS-1 primarily discussed the heroin business, and CS-1's intention to establish a base of operations in West Africa to store Taliban heroin so that it could be sent to the United States, Canada, and Europe.  Ahissou represented to CS-2 that he would to try to find someone who could help transfer the drug proceeds out of the United States.  The following day, August 25, 2010, Ahissou and Nasr met with CS-1.  At the August 25th meeting, the discussion focused on the cocaine transaction.  CS-1 explained to Ahissou and Nasr that, following the provision of a sample, CS-2 intended to purchase approximately 300 to 500 kilograms of cocaine.  CS-1 indicated that Saade, Nasr, and Ahissou would be responsible for obtaining the cocaine in West Africa, and that CS-2 would transport the cocaine out of West Africa.  Ahissou agreed to assist. Nasr explained that once the cocaine arrived in West Africa, he, Saade, and Ahissou would rent several houses, each of which could hold roughly 200 to 300 kilograms of cocaine.  (PSR ¶¶ 28-29).

Throughout September 2010, the parties remained in contact by telephone and email concerning the proposed cocaine transaction.  Specifically, CS-1 spoke on the telephone to Ahissou and advised him that he would return to Ghana later that month or in October.  Ahissou

responded that the cocaine would arrive soon and that he would be available to meet with CS-1 at that time.

The Confidential Sources returned to Africa to participate in several meetings with the defendants in October 2010.  On October 5 and 6, 2010, the confidential sources met variously with Ahissou's co-defendants Saade, Nasr, Martin Raouf Bouraima, a/k/a "Raoul," and Corneille Dato, a/k/a "Pablo."  During those meetings, the participants further discussed the details of the proposed cocaine and heroin importation transactions.   A few days later, on October 11, 2010, Ahissou, Saade, and Nasr met with CS-1 in Cotonou, Benin.  At that meeting, Ahissou and Saade informed CS-1 that the cocaine sample was not yet available because the person who had the sample had traveled to Nigeria.  The following day, on October 12, 2013, Ahissou met with CS-1, Saade, and a purported cocaine source identified as "Mustafa."  After some discussion, Mustafa refused to provide a sample of cocaine because he would not sell cocaine in increments smaller than 100 kilograms.  The next day, on October 13, 2010, Ahissou, Saade, and Nasr took CS-1 to meet an individual identified as "Mohammed."  Mohammed exchanged approximately 800 grams of cocaine for $20,700.  During the car ride back, CS-1 told Ahissou, Saade, and Nasr that CS-1 and CS-2 would use the sample to "test the way from Ghana to New York via the Delta flight."  (PSR ¶¶ 33-37).

Thereafter, in January 2011, Ahissou spoke on the telephone with CS-1.  During one call, CS-1 confirmed that the cocaine sample was sent to the United States successfully via a Delta airlines flight.  CS-1 also explained to Ahissou that his organization was pleased with the quality of the narcotics and wanted to move forward with a larger deal.  Ahissou responded that he was happy to do so.  (PSR ¶ 40).

4

### C.      Ahissou's Guilty Plea

On May 2, 2013, Ahissou pled guilty to Count Two of Superseding Indictment S1 11 Cr. 111 (NRB) (the "Superseding Indictment"), pursuant to a plea agreement (the "Plea Agreement") with the Government.  Count Two charges the defendant with participating in a conspiracy to distribute five kilograms and more of cocaine knowing and intending that the cocaine would be imported into the United States, from at least in or about June 2010, up to and including in or about February 2011, in violation of Title 21, United States Code, Sections 959 and 963.

Pursuant to the terms of Ahissou's Plea Agreement with the Government, the parties stipulated to an advisory Guidelines offense level of 35, calculated as follows:  (1) the base offense level is 38, pursuant to U.S.S.G. § 2D1.1(c)(1), because the conspiracy involved greater than 150 kilograms of cocaine; and (2) a three-level reduction for acceptance of responsibility is warranted, pursuant to U.S.S.G. § 3E1.1(b), because of Ahissou's recognition of responsibility and timely guilty plea.  Ahissou's Criminal History Category is I because he has no prior criminal history.  Based on this calculation, the parties agreed that the advisory Guidelines range is 168 to 210 months' imprisonment, with a mandatory minimum term of imprisonment of 120 months.  The defendant reserved the right, however, to seek to qualify for relief from the mandatory sentencing provisions of Title 21 pursuant to Title 18, United States Code, Section 3553(f), and/or for a reduction in sentence pursuant to U.S.S.G. §§ 2D1.1(b)(16) and 5C1.2. Since entering into the Plea Agreement, the defendant has fulfilled the "safety valve" requirements of 18 U.S.C. 3553(f), to the satisfaction of the Government.  Accordingly, the Government agrees that the Guidelines calculation set forth in the Presentence Investigation Report ("PSR"), as described below, is correct.

**D.      The Presentence Investigative Report**

The Probation Office issued its PSR in this case on July 24, 2013.  The Probation Office concurred with the parties' calculation of Ahissou's offense level, but also included a two-level reduction in the offense level, due to the defendant's successful post-plea safety valve proffer, pursuant to § 2D1.1(b)(16).  As a result, the Probation Office calculated the offense level at 33, resulting in an applicable Guidelines range of 135 to 168 months' imprisonment.  (PSR ¶ 92). The Probation Office further noted that the Court is not bound by the mandatory minimum term of 120 months' imprisonment.

The Probation Office recommends a term of 5 years' imprisonment.  (*See* PSR p. 23). The Probation Office based its recommendation primarily on the defendant's difficult upbringing and family circumstances, as well as his role in the offense.  (*Id.* at p. 24).

### III.  ARGUMENT

Ahissou willingly joined and participated in a conspiracy that aimed to import hundreds of kilograms of cocaine into the United States.  Ahissou participated in this conspiracy knowing that the proceeds of the cocaine sales would be used to help fund the Taliban's armed conflict against American military forces.  This conduct is extremely serious, and there is a need to deter both this defendant and others from engaging in such conduct.  Ahissou's crime therefore calls for a sentence within the applicable Guidelines range.

**A.      Applicable Law**

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult"

the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).  *See Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain

cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 522 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.      The Court Should Impose a Guidelines Sentence**

Pursuant to *Gall*, the sentencing analysis starts with the advisory Guidelines range. *See also* 18 U.S.C. § 3553(a)(4). The Guidelines range reflects the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). *Rita*, 551 U.S. at 349. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and accordingly, the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.*

A Guidelines sentence is appropriate in light of the nature of the offense and to address the goals of punishment and deterrence. The criminal conduct in this case was indisputably serious, involving an agreement with respect to huge quantities of cocaine that were to be imported into the United States. Perhaps even more significantly, the ultimate beneficiary of

these transactions was represented to Ahissou to be the Taliban, and it was made clear to Ahissou that the Taliban intended to utilize at least a portion of the narcotics proceeds to purchase weapons which would be used against American interests.

Ahissou was a key participant in this criminal endeavor.  He was brought into the transaction by co-defendant Saade to access sources of supply for cocaine in West Africa, which cocaine would ultimately fund the Taliban's violent objectives through distribution in the United States.   Moreover, Ahissou's participation in the conspiracy was extensive, spanning approximately eight months, from July 2010 through his eventual arrest in February 2011. During that time, Ahissou participated in eight meetings with the Confidential Sources (more than any of his co-defendants except Saade, who participated in nine meetings), and in numerous telephone calls and e-mails.  During the communications with the Confidential Sources, Ahissou discussed his role in the cocaine deal, described the pricing of cocaine in West Africa, introduced the Confidential Sources to two potential sources of supply for cocaine, and indicated his full understanding of both the ultimate beneficiary of the transaction (the Taliban) and the potential for large future transactions totaling hundreds of kilograms of cocaine.  Further, Ahissou was ultimately able to utilize his narcotics contacts to provide a sample of cocaine to CS-1, which purportedly would be tested prior to the consummation of the larger proposed transaction.  Thus, a Guidelines sentence is necessary and appropriate to provide adequate punishment for Ahissou's role in a significant, global narcotics conspiracy.

A significant sentence would also serve the goals of sentencing by providing for both specific and general deterrence.  A Guidelines sentence would powerfully impress upon the defendant that the costs of engaging in a narcotics conspiracy that sought to supply narcotics to the U.S., and to support the Taliban, far outweigh the anticipated financial benefits.  Perhaps

9

equally important, a Guidelines sentence will send a message to other similarly situated individuals who might choose to profit from narcotics trafficking that the United States will not tolerate such conduct, and that severe penalties will follow.

In sum, Ahissou was a critical participant in serious criminal conduct, the ultimate goal of which was to import large quantities of cocaine into the United States in order to fund the Taliban's efforts to combat American forces abroad. That conduct calls for a sentence within the Guidelines range, and such a sentence is sufficient but not greater than necessary to serve the goals of sentencing.

## C.    The Defense's Arguments for Extreme Leniency are Unavailing

In light of the defendant's conduct, the time-served sentence (approximately 29 months' imprisonment) that the defendant seeks is not appropriate. The defendant principally contends that a time-served sentence is justified because his detention has had particularly serious consequences for his family. (*See* Deft. Sent. Ltr. at 1). But the defendant's family circumstances, while quite difficult, do not justify the significant downward variance the defendant seeks. Even assuming that the defendant's detention is a contributing factor to his difficult family situation, it was the defendant's choice to engage in a multi-kilogram international narcotics conspiracy with purported representatives of the Taliban in the hopes of a large monetary reward. He knowingly took the risk that he would be caught and incarcerated, to his family's detriment. He is not unlike many international narcotics trafficking defendants whose crimes result in incarceration far from their homes and family.

The defendant also argues that like the defendants in *United States* v. *Issa*, 09 Cr. 1244 (BSJ), the "non-political" nature of his motivation to engage in the instant offense should weigh in favor of a downward variance from the applicable Guidelines range. (*See* Deft. Sent. Ltr. at 2-

10

3).  The comparison to the *Issa* case is misplaced.  The defendants there were convicted of material support to a designated terrorist organization and received increases in their Guidelines calculations because the Court applied the terrorism sentencing enhancement, pursuant to U.S.S.G. § 3A1.4.  Thus, then-Judge Jones found that the defendants' lack of an ideological motivation for helping a terrorist organization made it less likely that they would ever commit such crimes in the future, and therefore, varied downward in their sentences.  Here, by contrast, the defendant pleaded guilty to a drug trafficking crime only, received no terrorism sentencing enhancement, and was motivated by financial gain to engage in the drug trafficking conspiracy – albeit a scheme that was represented to him as one that would benefit the Taliban.  Thus, his motivation to participate in similar conduct in the future is likely to exist even after he is released from U.S. custody.  Accordingly, the defendant's lack of any ideological commitment to the Taliban does not warrant the requested downward variance.

The Government respectfully disagrees with the Probation Office's recommendation of a five-year sentence.  (PSR at p. 23).  The Probation Office explains its justification for a proposed six-year downward variance by reference to the defendant's family circumstances, his difficult childhood, and his role in the offense.  (*Id*. at p. 24).  The factors that the Probation Office relied on do not justify such a substantial variance.  The abuse Ahissou allegedly suffered between the ages of nine and eleven is only marginally relevant to the issue of the appropriate sentence for a crime committed in his mid-forties.  For the same reasons stated above, the deleterious impact of Ahissou's imprisonment on his family does not call for the five-year sentence recommended by Probation.    Finally, Ahissou's role in the offense does not warrant a five-year sentence.  His job was to find a source of supply for hundreds of kilograms of cocaine that the Confidential Sources were going to send to the United States on behalf of the Taliban.  Ahissou was not a simply an

11

errand-runner or courier, he was a serious player in a large-scale narcotics conspiracy that was going to send  hundreds of kilograms of cocaine into the United States to fund the Taliban.  A five-year sentence would not reflect the seriousness of Ahissou's criminal conduct, nor would it sufficiently deter the defendant or other similarly situated individuals from future crimes of the kind Ahissou committed.

12

## IV. CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court

impose a sentence within the applicable Guidelines range of 135 to 168 months' imprisonment.

Dated:          New York, New York
                August 2, 2013

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States of America


                            By:       /s/
                                        Christian Everdell
                                        Aimee Hector
                                        Glen A. Kopp
                                        Assistant United States Attorneys
                                        Tel.:  (212) 637-2556/2203/2210

## **Affirmation of Service**

GLEN A. KOPP, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury, that he is employed as an Assistant U.S. Attorney in the Southern District of New York, and that, on August 2, 2013, he caused copies of The Government's Sentencing Memorandum for Francis Ahissou to be served via electronic notification and email:

Joel M. Stein, Esq.
39 Broadway, Suite 2420
New York, NY 10006

/s/
GLEN A. KOPP
Assistant United States Attorney

14