# EXHIBIT C

D9P7POUS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          11 Cr. 111 (NRB)

ALWAR POURYAN,

                Defendant.

------------------------------x

                                        September 25, 2013
                                        3:15 p.m.


Before:

                    HON. NAOMI REICE BUCHWALD
                                        District Judge


                        APPEARANCES

PREET BHARARA
      United States Attorney for the
      Southern District of New York
BY:   CHRIS EVERDELL
      AIMEE HECTOR
      GLEN KOPP
      Assistant United States Attorneys

LEE GINSBERG
      Attorney for Defendant

(Case called)

(In open court)

MR. EVERDELL:  Good afternoon, your Honor.  Christian Everdell, Glenn Kopp and Amy Hector for the government.

MR. GINSBERG:  Lee Ginsberg appearing for Mr. Pouryan. I am ready to proceed, your Honor.

THE COURT:  All right.  Let me begin, as is customary, by confirming that I have received everything that I should have in connection with the sentence.

First, there is the report of the probation department.  My copy has a cover memo date of August 22.  Next I have the sentencing memorandum submitted by Mr. Ginsberg on behalf of Mr. Pouryan, which was filed on September 16.  And then finally I have the government's sentencing memorandum which bears the date of September 21.

Are there any other documents that I should have received in connection with the sentencing?

MR. GINSBERG:  No, your Honor.

MR. EVERDELL:  No, your Honor.

THE COURT:  OK.  Can I confirm that both parties have received a copy of the probation report?

MR. EVERDELL:  We have, your Honor.

MR. GINSBERG:  Yes, your Honor, I have received a copy.  I have reviewed it with my client.

THE COURT:  Does anyone have any objections to it?

MR. GINSBERG:  No, your Honor.

MR. EVERDELL:  No, your Honor.

THE COURT:  Mr. Ginsberg.

MR. GINSBERG:  Your Honor, I don't know that there is a lot to say in this sentencing proceeding, although there is probably a lot to say about this case.

Taking the lead from the probation report, they recommend that your Honor impose the mandatory sentence that the statute requires, which is 25 years.  And also looking at the government's submission, while they don't make a recommendation, they recognize on the first page I think of their letter that while the guidelines could reach life, a sentence less than life would be sufficient and reasonable in this case, and they cite the language from the statute.

Of course, it is our position that the 25 year mandatory minimum sentence is not only appropriate but more than necessary in a case like this, where your Honor has no discretion to give a sentence less than that.

It is hard not to say anything about my client, even though I'm hopeful that the court will see that that sentence is sufficient.  And we did lay out in our submission to the court his history and background, which your Honor heard firsthand from my client when he testified.

So, whatever your Honor heard during the course of this case that caused the court -- and you did give reasons

D9P7POUS

when you announced your verdict -- but caused the court to determine that he was guilty of an obviously serious charge, your Honor also heard in pretty great detail the story of his life.

And the story of his life, as I think I said to some degree in my summation, up until about two or so years before the point he was arrested, is one that may have been commended to many people who struggled in various different ways throughout their childhood and their teenage years and adult life because he got to a place where he became a citizen, he became productive, he served the United States in his capacity as an interpreter and sort of a cultural attache, if you will, for quite some time in Iraq, and had Army personnel willing to come to court and testify on his behalf as to what he did for them and what their view of him was, which I think in and of itself is relatively unusual.  Given the nature of this case, and given the fact that those gentlemen knew what the charges were, they were still willing and prepared to come to court and say what they knew about Al Pouryan, all of which was extremely positive.

And without the mandatory minimum that precludes your Honor from giving a sentence below that, I would suggest that all of those things that were said in court about him, and that we know of from his past, would normally be significant mitigating factors to permit a court to seriously consider a

D9P7POUS

lower sentence.

There is a lot between zero and 25 that would still serve the purpose of punishment in this case, even for a crime of this nature, but, as I said, the court doesn't have the ability to do that.

Beyond that, your Honor, I have to admit that although I'm close to the situation not only as a representative of my client, and his lawyer, but I'm close enough to the situation that there are still parts of this case that really mystify me.

There are people who moved in and out of this case, who I don't think we really understand what their roles or functions were.  There were things that happened on both I guess I could say this side of the table and by some government personnel that I don't quite understand, but that's really not for me to dote on today at least, or to question at this point, since we are only here for sentencing, and it can't change what the court sentences.

I think overall the court certainly has probably a more substantial picture of Mr. Pouryan because of the kind of case this is, and because he testified and other people testified about him, than a court might normally have in a sentencing proceeding.  Therefore, I hope the court, with all of that information, feels that 25 years is certainly sufficient punishment for this crime and does not consider imposing a sentence that is more than the mandatory minimum.

D9P7POUS

Thank you.

THE COURT: Would Mr. Pouryan like to speak now, or maybe after the government?

MR. GINSBERG: I guess if he had an opportunity to speak after, he would prefer that.

THE COURT: OK. Does the government wish to say anything?

MR. EVERDELL: Thank you, your Honor. Your Honor, this was an extremely serious crime that calls for an extremely serious sentence. The facts of this case are already very familiar to the court, having presided over the trial several months ago. I won't elaborate too much on that.

Quite simply, the proof at trial showed the defendant agreed with his co-defendant Oded Orbach to provide lethal military-grade weapons, including surface-to-air missiles to a DEA confidential source, believing that these lethal weapons would get into the hands of the Taliban, who would use them to kill U.S. soldiers in Afghanistan.

Those facts alone are shocking, but other facts were proven in addition to those at trial that makes the defendant's crime even more chilling.

First is that I think there was ample proof at trial to show that this was not the defendant's first weapons transaction. There was proof that in April of that same year as the Taliban deal started in 2010 there were negotiations to

D9P7POUS

provide weapons an embargoed West African nation.  And then in September of that same year, just before the Taliban deal started, there were similar negotiations or discussions about providing weapons to the Sudan.

And there was other proof that showed that the defendant was in the process, during this time period, of starting a security services business to profit from this type of transaction.  It was @Kit and Boodle that was mentioned in a number of the documents that we introduced into evidence.  So , this was going to be a profit-making mechanism for the defendant and his co-defendant Oded Orbach.

Second, your Honor, as we pointed out in our submission, one fact that I think makes this quite unique is the fact that Mr. Pouryan did at one time serve in the U.S. military as a translator.  I think that the fact that he was willing to put in harm's way potentially some of the same men and women that he served with in Iraq is particularly chilling and particularly demanding of the court's attention, because it is a fairly, I would say, unique fact in this case and one that counsel's in favor of a severe punishment.

Finally, your Honor, the fact that in the government's eyes at least the defendant took the stand and lied, committed perjury on the stand, is something that warrants this court's attention and is something that demands serious punishment.

I think there is ample proof, given the defendant's

D9P7POUS

testimony, that it was fundamentally inconsistent with the government's proof at trial, and in fact the court at one point in the court's comments, as the verdict was read, called the testimony fanciful and illogical.  The government agrees with that.

I think that there is no question in our mind that the two point enhancement applies for obstruction.  The points aren't necessarily the most significant in this case given what the guidelines range is, but the fact that he chose to do that and lie to this court is something that is another factor that is above and beyond the shocking facts of simply providing arms to people who he believed would commit terrorists acts.

So, your Honor, in sum, this case demands serious punishment.  Defense counsel is quite right we did point out in our submission that a sentence below the life guidelines range could be sufficient.  Nevertheless, given everything that transpired in the case, and the additional factors I just mentioned, the government believes that a significant serious sentence is appropriate.

Thank you, your Honor.

THE COURT:  Mr. Pouryan?  You can stay seated.

THE DEFENDANT:  In the trial your Honor heard everything and, as you know, the government says I'm a liar. That's all right, I'm a liar, John Petreaus is a liar, Eddie Gunhus is a liar, Gail is a liar, the CIA agent is a liar,

everybody is a liar.

In this case I have more evidence, and I want the evidence to be in the court, and you put it there and you see who's the liar.

I give my life for this country, I serve this country, I would still do it.  There is nothing personal between anybody here.  I respect your Honor; you did your job.  You heard the story for the government, and you find me guilty.  That's true, right?  I assume.

THE COURT:  I found you guilty.

THE DEFENDANT:  Because of the government, what they said, right?

THE COURT:  Based on all the evidence that I heard.

THE DEFENDANT:  OK.  Which evidence do you need, your Honor, to find me not guilty?  I just want to know.  I want somebody to give me an answer.  In this court I want somebody to answer me, which part of my story was not true?

THE COURT:  We're noted engaging in this conversation, Mr. Pouryan.  I have already ruled.

THE DEFENDANT:  But, your Honor, you are going to sentence me today, and I want to know what makes you believe I'm a liar, which part of my story.

THE COURT:  In my verdict I made specific references to your testimony and why I found it to be untrue.  Beyond that, we're not having this conversation.  The verdict is in.

THE DEFENDANT:  OK.  The government says I want to make money, right, in this transaction?  How much money was I making?  They say $200,000.  Right?  That's what they said, I made a couple hundred thousand dollars.  Why the government didn't bring the proof?  I have a check under my name $2.7 million which I give to the U.S. government, and they stop it.  Why didn't they bring this evidence to the court, your Honor?

There is discovery, and you have to see all the discovery.  Why do you have to believe the government, what they say, and you don't believe me?  I just want to know why.  Because of my background?  Because of, I don't know, where I am from?  I don't understand.  I'm confused here.

Eddie Gunhus came here, and he said I give them permission and I put it in the trash.  I want to know how much other information he put in the trash, how many American soldiers died because of the information he threw in the trash.

5,000 American people died in Iraq, men and women, serving this nation, under the command of General Petraeus and his staff.  I want to know how many people have been killed because Eddie Gunhouse didn't pay attention to the information.

I would like to know in that time that he said he was in Germany, which General Petraeus he's carving a turkey Thanksgiving day in Kabul, he came under oath and he lied about it, your Honor.

I'm not going into detail.  There is more evidence of

D9P7POUS

more people who lied.  Those agents, they put their life, they go after the terrorists, they are doing their job.  There is nothing personal between me, you and them.  Everybody here did their job, including Al.

They have a billion dollar budget.  They have a private jet.  They have thousands of CIA working all over the world working for them, but I was just Al, one person.  I was begging everybody to help me to save American lives.  And there is the proof all in the black and white, your Honor.

This is my life.  You see my picture when I came to the United States, and you see me now?  Am I having too much fun in my life?  There is a picture in discovery.  Look at the time, Sunday, September 21, 1997, I arrived to the United States, and look at me now.  Is this Las Vegas, every day go out playing with my life?  I go to Lebanon for fun?  People go to Lebanon for fun for two and a half years tracking a terrorist?  That's appreciation here from the United States? Thank you very much?  25 years sentencing?  And they did me a favor for 25 years?  This is my life now.  I want to be selfish today.

I was not there for $200,000.  I was not there for $200 million.  I was not there for $200 billion.  If I was making money, I would go to Iraq and sell oil.  I would make $190,000 a month.  But because the way of my life, the way I grew up, truly I believe I have to do whatever is necessary to

D9P7POUS

do.

Everybody came here, they say whatever they say.  They lied.  I'm not going to say they're lying.  Maybe they don't have a good memory.  As Gayle says, she has a short memory.  But in the phone conversations I had with Gail, I told her specifically there is people, they want to buy weapons to kill Americans.  And we have enough technology, we can go back and find the phone call I had with Gail and listen to it.  We have that technology in this country, I assume.  With the trillions of dollars our agencies are working and spending on the war, Al Pouryan, terrorist to justice?  I'm sorry, I didn't know he's Jewish.  I apologize.  If I have to go say I'm sorry, I will do it.

I'm sorry, I didn't know he's a Jewish Israeli.  I was after the Al Qaeda, and he came to my table.  What did I do with him?  Let him go?  No.  I contact the State Department.  I told them this gentleman wanted to do a deal with Iran, he wanted to sell equipment and this equipment would be used against a humanitarian and our U.S. soldiers in Iraq.  Next I ask him for weapon, he says I have a weapon.  What did I do with him?  Let him go?  No.  I know I was playing with sharks, but I did it.  And I'm proud, and I take full responsibility for that mission.  Now the government is going to give me a favor for 25 years?

Those people, they read the newspaper, and they want

D9P7POUS

to give me 25 years?  They offered me 25 years.  Your Honor, are you telling me 25 years is good?  They never seen nothing in their life.

I have been polite with the court always, and I will be polite forever.  Your Honor has to check what's going on in this case.  There is more than this case.  There is more, more, more, more.  I didn't lie.  That's why I'm asking which part of my testimony was a lie?  You find me a liar?  Tell me, I'll bring evidence for you.  There is no problem.

This is my life.  I haven't seen my son yet.  My wife and my son, they are in Lebanon, the most dangerous place in the world, with no money, with no home, with no car, with nothing.  Because what?  Because I tried to save American lives?

Al Pouryan was one person, and he did everything possible to save American lives.  And I did.  But nobody is going to believe it.  Nobody in this room is going to believe Al went to Lebanon for the first time and I go follow terrorists, because those people don't want to believe.  They never go through the way I grew up in my life.  They didn't lost their family members.  Their school has never been destroyed.  Their childhood friend never gets killed.  They never heard a bullet in their life.  They never heard a bullet across their ears.

I have more evidence.  I'm not ready for being

D9P7POUS

sentenced today.  I wanted some quiet time with you, just me and you, I wanted to show you some stuff, just keep it for your Honor, and see who is a liar.

I didn't lie under oath.  The first day I meet this gentleman I told him I'm not going to lie to the judge.  Maybe I lied all over the world to Russia, to China, to Iranian, I lied, yes, but I never lied to this gentleman, and I never lied to your Honor.

I want to know what part of my testimony that says I lied.  One part.  I will bring evidence; there is no problem.  And I will show the United States has too many people in Lebanon.  We pay them millions of dollars a year to collect information for us.  And I actually have the power to go back to Lebanon and ask what I was doing there, who was my friends.  I can go to Iraq and ask the entire terrorist division -- which one of my friends, he get killed after the trial; somebody shot him in the head suddenly, the gentleman I was working with -- so, now I don't have anybody to go to to collect my information, because he was fighting Al Qaeda.  Al Qaeda went to his house and killed him in front of his kids and his wife.  That's the type of business we are dealing with.  We are not going there to play games.  No, we play real game.

So, my life is in your hands, your Honor, and you make the decision what you want to do.  I really deserve to be in jail?  These past 30 months, have you ever been to Romania to

D9P7POUS

see where I was for three months?  Has your Honor been to MCC, MDC, how we live, what type of environment we have there, what type of people we deal with?  The person for one dollar, he wouldn't kill somebody for it?  They put me in that environment?

I don't know what to say.  I'm very disappointed.  I am very disappointed in the United States government and how they act in this case especially.  Why did they never say the CS3 and the meeting -- that meeting in December 9 is a very, very important meeting, what he told me and what I told him. And where was Mr. Oded in that time?

But they showed you, your Honor, what they want to show.  They didn't show you the CS3 said so now he know who I am.  They didn't say I know the CS4, who he was, in December 2010, when he was following me into Turkey.  They didn't show those things.

They didn't say why I went to @Cyprus to meet one of my people there and I texted CS3, yes, your friend is again in my plane.  They don't say the truth, and they call me a liar. That word is too big, to call somebody so honest and say I'm a liar.  And I'm sure they are built this way, and they have to deal with it.

I have more evidence, more evidence right from Romania which I hide it there.  My family hired an attorney.  He traveled to Romania, I think, to get some evidence to show to

D9P7POUS

your Honor who is a liar. I'm not a liar. I'm just a cook in some hotel in Arizona. You're right, I was just a cook, that's it, but I have a belief. I work hard for my money. I work 19 hours a day to make money. I didn't go selling drugs. I didn't go sell a weapon. I never lied to people in jail. No. There is evidence I work 19 hours a day to build my life, and I left everything behind to go to Lebanon to defeat enemies.

This enemy we're dealing with, my ancestors have been dealing with them for 1500 years, before even the United States was founded. I fight those enemies. My great grandfather fight those enemies, and we are still continue fighting, because we are all on the same path, we don't believe what they believe. We believe in freedom. We believe in democracy. We believe human beings have to live in peace, and with love, and with passion of the family. That's what we believe. I did not come to the court to lie to the judge and justice.

Your Honor has enough experience to look at anybody and say this guy or not, but you don't have a chance because it was a nonjury trial, and the government feed you with all of this evidence they have, which don't all belong to me.

They didn't bring my computer here to show to your Honor. Did they bring my computer to the court? No. Did they bring my phones to court? No.

They want to give me 25 years? I pass that time. You look at me, I'm like 55 years old. I'm 39. Because I had too

D9P7POUS

much fun in my life?  I enjoy my life?  That's why.  I went to Iraq; I'm proud of what I did.  At least I saved a lot of American lives in Iraq.  Those commanders, they came here to testify, they didn't lie, they say the truth.  Every day we went out, it was possible to get killed.  We choose to do it.

Nobody pushed me to do it.  I volunteered to go to Iraq to defeat the enemy.  Those people, they killed my childhood friends.  Those people they did 9/11.  To this date they are still killing Americans.  Now sitting here, they are making plots to kill Americans.  Not just Americans.  They are defeating the whole world.

But the United States, we have power, we have the money, we have the influence.  OK, we go after the terrorists. They didn't give me a chance to do it.  They said you cannot do it.  I injured my knee; I didn't injure my brain.  My brain is still focusing and working.  I have a problem with my knee.

They want to give me $5,000 a month for the rest of my life, OK, go, stupid man, sit at home, we don't need you any more.  No, that's not me.

The last drip of my blood I want to do what I have to do.  It's not about the United States; it's going back 10,000 years ago.  This is my life, your Honor.  I want to give you more evidence.  I'm not ready for sentencing.  Before I go to jail, I want you to find out who is the liar.

THE COURT:  Mr. Pouryan, thank you.  The trial is

D9P7POUS

over; there is a verdict; and now it's sentencing time.

I just want to make sure the government doesn't want to say anything else at this time.

MR. EVERDELL:  No, your Honor.

THE COURT:  OK.  I have already stated on April 19 my view of the evidence in this case and commented on the veracity of Mr. Pouryan's testimony.

Briefly, I found that the evidence proved beyond a reasonable doubt that Mr. Pouryan and his co-defendant were guilty of Counts Four and Five of the indictment, respectively, a conspiracy to provide material support to terrorists and with a conspiracy to acquire and transfer antiaircraft missiles.

As the evidence established, the recipients of this weaponry was to be the Taliban, who were going to use those weapons to protect their heroin production.

I also found when I rendered my verdict in this case that Mr. Pouryan's trial testimony was not credible and, given its fanciful shifting and illogical quality, was indeed materially false and not simply confused.  If the guideline calculation mattered, I would add two points for obstruction of justice.

It is fortunate that the government's evidence in this case was in the form of documents -- many between the defendants -- and tape recordings, because otherwise it would be hard to imagine that someone with Mr. Pouryan's personal

history could even have considered this crime.

Mr. Pouryan grew up in a war zone where relatives and classmates of his were killed on maimed.  Mr. Pouryan then received United States citizenship as a political refugee. Better than most, Mr. Pouryan understood firsthand the harm that the weapons that he was prepared to sell to the enemies of the United States could do.  To endanger citizens of the country that gave him sanctuary is heinous.  Clearly, anyone in his position who would commit these crimes for no reason other than money is lacking a moral compass.

All this being said, the mandatory minimum that Mr. Pouryan faces on Count Five of 25 years is a long time, a very long time by any measure, and is sufficient to serve the purposes of sentencing to punish, deter and promote respect for the law.

So, to be slightly more precise, Mr. Pouryan is sentenced on Count Five to 25 years, or 300 months; on Count Four, to 15 years, or 180 months.  The two sentences are to be served concurrently.  He is placed on supervised release on both counts, to be served concurrently.  There is a $200 mandatory special assessment.

All of the mandatory standard and special conditions of supervised release, which are set out at page 24 of the presentence report, are imposed.

I advise Mr. Pouryan that he can file an appeal within

D9P7POUS

14 days.  And also there is a preliminary order of forfeiture?

MR. EVERDELL:  One matter, your Honor, before the forfeiture.  I don't know if your Honor specified the number of years of supervised release.

THE COURT:  I believe I said ten.

MR. EVERDELL:  Thank you, your Honor.

THE COURT:  Both to be served concurrently.

Mr. Ginsberg, any particular comment on the preliminary order of forfeiture?

MR. GINSBERG:  Yes, your Honor.  I spoke with the government.  Well, first, I responded to their e-mail with the attachment yesterday, and I spoke with the government before this proceeding.

I think what we have agreed, if your Honor permits it, is to have your Honor enter a general order of forfeiture, to permit me some additional time to see whether or not I can litigate some of the specifics.

The forfeiture in this case falls under one of the many subdivisions.  Most of them don't apply.  It falls more under a generic subsection that permits just general forfeiture when there is a conviction for this kind of crime.

It strikes me -- and I honestly really wasn't focusing on the forfeiture in this case until I got the order yesterday and looked at it -- it strikes me that at the very least there may be a constitutional argument to be made in terms of

deprivation of property under some theory that there is a lack of connection, the crime that's been committed, to the property that's sought to be forfeited.

I will in quick order do my research. If I find that I don't have merit to make that argument, I will advise the court and I will advise the government. If I find that there is some merit -- which I'm sort of stretching back now to my law school days -- if I find that there is some merit based upon what I think the law ought to be, I will submit the appropriate motion papers.

THE COURT: I'm just not sure what you want me to do or not do.

MR. GINSBERG: What we agreed is not specifically to order forfeited the items listed, to just issue a general order of forfeiture and leave for another day as to what items that are in that list should be forfeited. And then we can see if it's going to be litigated further, or your Honor could then enter a final order listing any or all of the items, based upon what may be done as we move forward.

MR. EVERDELL: Your Honor, I think if I can elaborate on that slightly. We were informed by Mr. Ginsberg last night that he may want to bring this argument. There is a provision in Rule 32.2. Normally you would enter a final order of forfeiture at sentencing, but if you cannot determine at this time all the specific property that's subject to forfeiture,

D9P7POUS

there is a provision under Rule 32.2(b)(2)(C) by which the court can order what is called a general order of forfeiture that does not specify any particular property to be forfeited, and contemplates that at some date in the future that order will be amended or modified to list out the specific property once the determination is made about what should be on the forfeitable list.

So, I think what Mr. Ginsberg is contemplating is that there may be in his mind some sort of as applied challenge to the terrorism forfeiture provision that could be styled as some sort of due process argument, I don't know, but might be meritorious in his eyes, since some of the property we would have to see what the argument looks like.  But there may be some argument he wants to bring on that score.

I think what we are contemplating here is a brief period for him to research that issue and determine whether he even feels like there is a meritorious issue to raise -- and we can decide how long that should be -- but that the general order of forfeiture could be entered today; it would cover that time period; and then if Mr. Ginsberg decides he does not want to bring that motion, the more specific order of forfeiture, the final order of forfeiture, could be entered at that time. And if there is going to be some sort of briefing on this, we would have to address that in a motion schedule.

THE COURT:  Here is my primary reaction to what you

D9P7POUS

said. The argument that Mr. Ginsberg wants to make is that the forfeiture statute which applies in a terrorism case, that says basically you can forfeit the property of the defendant, and which doesn't contain a requirement that it be the proceeds of the crime or otherwise specifically linked to the crime, is a general argument, and whether or not -- if he wins, I think that, if I'm correct, that there isn't a specific link --

MR. EVERDELL: Your Honor, we would actually have to go back and look to see if we could make an argument as to any particular piece of property, that it could be linked to the crime, or as in the crime, or some other statutory quote that could be used to link it to the crime.

I mean to be clear, the government's position is that we don't believe this is a meritorious argument. The statute has been on the books for a long time, and we believe that there is not going to be anything to litigate here. Nevertheless, we are conscious of the fact that Mr. Ginsberg may want to raise this issue, and we didn't want to delay sentencing today. And this provisional measure allows the sentencing to be entered without this issue being resolved.

THE COURT: Do you have an alternative order?

MR. EVERDELL: Yes, we have our -- no, no, I'm sorry. To effectuate this, the court would simply enter orally, saying I order a general order of forfeiture on the record. There is nothing written. And it's subject to amendments at a later

D9P7POUS

date, and we should probably pick a date by which our preliminary order of forfeiture would be made final if Mr. Ginsberg doesn't come up with his argument.

THE COURT:  All right.  I have no problem following that procedure and entering a general order of forfeiture at this time.  I welcome any suggestions about timing.

MR. GINSBERG:  I would ask for 30 days to make a submission.  I'm supposed to start a trial on October 15, which I'm preparing for, but I think that will give me enough time to do both and have an answer.  I don't know that there is going to be a lot of law to look at.  Once I take a look at the leading cases, I think I will probably have an answer pretty quickly.

THE COURT:  OK.

MR. EVERDELL:  Just as your Honor is considering that, I do want to pass up -- I don't think I gave the court the most updated one.  There were some typos that we fixed.  So, I am going to give the defense counsel and the court a copy of the most recent preliminary order of forfeiture.

THE COURT:  All right.  So, let's say 30 days from now, October 28.  And how much time would the government like to respond if Mr. Ginsberg makes an affirmative motion on this.

MR. EVERDELL:  Your Honor, in the event that the motion is submitted, I think two weeks we would like to respond.

D9P7POUS

THE COURT:  OK.  November 12.

MR. EVERDELL:  Thank you, your Honor.

THE COURT:  Is there anything further at this time?

MR. GINSBERG:  No, your Honor.  You did mention --

THE COURT:  -- the right to appeal.

MR. GINSBERG:  -- right to appeal.  And we do intend to file a notice of appeal.

MR. EVERDELL:  To the extent there are any underlying open counts, we move to dismiss those at this time.

THE COURT:  OK.  Very good.  Thank you.

                                * * *